**NOT FOR PUBLICATION**                                    **CLOSED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
_____ :
                                :
DANNY HARRIS,                   :
                                :      Civil Action No. 03-5847 (JLL)
             Petitioner,        :
                                :
        v.                      :
                                :           OPINION
TERRENCE MOORE, et al.,         :
                                :
             Respondents.       :
_____ :
```

**APPEARANCES:**

    DANNY HARRIS, Petitioner Pro Se
    # 258997
    East Jersey State Prison
    Lock Bag R
    Rahway, New Jersey 07065

    LINDA K. DANIELSON, ESQ.
    Office of the N.J. Attorney General
    Division of Criminal Justice, Appellate Bureau
    Richard J. Hughes Justice Complex
    P.O. Box 086
    Trenton, New Jersey 08625-0086
    Attorneys for Respondents

**LINARES, District Judge**

        This matter is before the Court on petitioner Danny Harris'
application for habeas corpus relief under 28 U.S.C. § 2254.  For
the reasons stated below, the petition for habeas relief will be
denied for failure to make a substantial showing of a federal
statutory or constitutional deprivation.

I.  <u>BACKGROUND</u>

A.  <u>Procedural History</u>

Petitioner, Danny Harris ("Harris"), is presently confined at the East Jersey State Prison in Rahway, New Jersey, serving an aggregate sentence of 30 years imprisonment with a 30-year parole disqualifier.

Harris was convicted in a capital trial by a jury in the Superior Court of New Jersey, Law Division, Essex County on or about February 10, 1994 on charges of purposeful or knowing murder, conspiracy to commit murder, and weapons offenses.  The jury declined to impose the death penalty.  Instead, Harris was sentenced to a term of 30 years in prison without parole eligibility.  He appealed his final judgment of conviction to the New Jersey Appellate Division.  In a published Opinion decided March 18, 1997, the Appellate Division affirmed the conviction. <u>State v. Harris</u>, 298 N.J. Super. 478 (App. Div. 1997). (Appellate Division Opinion, decided March 18, 1997, RE 6[1]).  The New Jersey Supreme Court denied certification on June 30, 1997. (RE 9).

Sometime thereafter, Harris filed a state post-conviction relief petition ("PCR"), alleging claims of ineffective assistance of counsel, faulty jury instructions, and newly

_____

[1]  "RE" reflects the respondents' appendix or exhibits with respect to the relevant state court record submitted with their answer to the petition.

2

discovered evidence.  An oral hearing was held before the Honorable Eugene J. Codey, J.S.C., on November 28, 2001.  (RE 29).  Judge Codey denied relief by written decision issued on December 3, 2001.  (RE 10 at Da68-74).  Harris appealed, and on February 18, 2003, the Appellate Division filed a <u>per</u> <u>curiam</u> Opinion affirming denial of post-conviction relief.  The New Jersey Supreme Court denied certification on June 20, 2003.

Harris filed this federal habeas petition on or about December 8, 2003.  The State responded on April 26, 2004, and provided this Court with the relevant state court record.  Harris then filed a traverse to the respondents' answer on or about June 21, 2004.

B.  <u>Factual Background</u>

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference under 28 U.S.C. § 2254(e)(1), will simply reproduce the New Jersey Appellate Division's factual recitation:

> The prosecution's theory was that defendant was hired by Georgia Wooten and Walter Wilson to kill Rondell Germany, the former boyfriend of Wooten's sister, Michelle. Wooten promised to pay defendant $500 to commit murder.  As part of the plot, Wooten lured Germany to her apartment building under the guise of mediating his dispute with Michelle. Defendant confronted Germany in the hallway and shot him from a distance of ten feet.  Germany staggered into Wooten's apartment and fell to the floor.  Defendant then stood over the victim and fired a second shot.
>
> The killing was witnessed by Wooten's son, Lawrence.  He testified in graphic detail about the chronology of events leading to Germany's death.  According to Lawrence, his

3

mother and Germany were seated on the second floor landing when defendant entered the building, pulled a gun from his waistband and opened fire.  Lawrence recounted that his mother immediately left the hallway and entered her apartment.  Defendant then pursued Germany, who managed to kick in the door to Wooten's apartment before collapsing. Defendant quickly entered the room and fired another shot into the prostrate victim.

Lawrence testified that several minutes after the killing, the telephone rang.  Responding to the call, Lawrence recognized the voice of his cousin, Wilson, who asked to speak to his mother, noting that he was calling at defendant's behest.  After Wooten picked up the receiver, Lawrence, from a kitchen extension, heard Wilson tell his mother that defendant said he needed the money to flee the city that night.  Wooten told Wilson not to come to the apartment, but that she would give the money to Lawrence. Wilson asked whether defendant had shot the victim in the heart.  Wooten replied that she did not know, but that she believed defendant had shot Germany twice.  The telephone call then terminated.

The police were immediately dispatched to Wooten's apartment where they found the door frame damaged as if there had been a forced entry.  Germany was lying face down on the bedroom floor.  Additional police personnel arrived shortly thereafter.  As he mounted the stairs to the third-floor apartment, Detective John Molisso discovered a 9-millimeter Luger caliber bullet and a shell casing.  A bullet hole was discovered in the floor of Wooten's apartment.

Earlier, Officer Peter DeAngelis had noticed an answering machine on a nightstand adjacent to the bed in the room in which the victim was found.  The light on the machine was blinking, indicating that there was a recorded telephone message.  Because the room was in disarray, DeAngelis decided to secure the tape to insure its preservation.  When Molisso subsequently arrived at the apartment, he asked Wooten whether she would consent to a search.  Wooten, who at the time was not considered a suspect, appeared cooperative and executed a written consent to search.  The search yielded no incriminating evidence.

Wooten, Lawrence and Michelle were then transported to police headquarters for the purpose of giving statements. Before commencing the witness interviews, DeAngelis and Molisso listened to the tape for the first time, but could

4

not identify any of the voices.  The officers replayed the tape when they interviewed Michelle.  She identified the two primary speakers as Wooten and Wilson.

Recognizing that Wooten was now a prime suspect, the police advised her of her constitutional rights.  She then confessed that she had hired defendant to kill Germany and that she had given Lawrence $500 to pay him for committing the crime.  Wooten then executed a second consent to search. Molisso returned to Wooten's apartment and retrieved the $500 from Lawrence.  Although Wooten's statement was not produced at defendant's trial, the tape recorded telephone call was played for the jury.

Defendant was arrested shortly after the killing.  After being apprised of his constitutional rights, defendant gave a written statement indicating that he agreed to accompany Wilson to Wooten's apartment where Wilson was to "beat up" Germany in retaliation for Germany's violent assaults upon Michelle.  Defendant further agreed to bring his gun so that Wilson "could take care" of Germany.  Upon arriving at the building, the two men mounted the stairs.  In his statement, defendant claimed that Germany "spotted" the gun and "charged" him.  According to defendant, the gun fired twice as he fell against the wall.

(Appellate Division Opinion, decided March 18, 1997, at pp. 2-5, RE 6).

## II.  CLAIMS FOR HABEAS RELIEF

Harris raises the following claims in his federal habeas petition: (1) "[p]etitioner was denied his constitutional right to confront his accusers under the Sixth Amendment's Confrontation Clause, when a tape recording between Georgia Wooten and Dwayne Wilson was admitted into evidence under the co-conspirator hearsay exception without sufficient independent proof of testimonial trustworthiness"; (2) "[p]etitioner was denied his constitutional right to due process to a fair trial by

5

the perjury of Terry Coleman, in part induced by the police"; (3) petitioner was denied effective assistance of counsel; and (4) "[p]etitioner was denied due process by repeated hearsay testimony of Detective Molisso after the court had already ruled on hearsay and given the jury instructions regarding hearsay." (Petitioner's Brief, at pp. 6, 11, 15, & 19).

The State argues that petitioner's claims are without merit. The State also asserts that several of the claims are unexhausted and/or procedurally defaulted.  Harris filed a traverse arguing that his claims were substantially presented on state court review.  Having reviewed the record, the Court is satisfied that all the claims have been exhausted in state court, with the sole exception being petitioner's alleged <u>Brady</u> violation in connection with witness Terry Coleman's testimony at trial. Nevertheless, this Court finds that, to the extent this or any of the claims asserted by Harris in this petition were not exhausted in state court, the Court may opt to review such claims, and deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2).  Section 2254(b)(2) provides that "[a]n application for writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  <u>See</u> <u>also</u> <u>Lambert v. Blackwell</u>, 134 F.3d 506, 514-15 (3d Cir. 1997), <u>cert</u>. <u>denied</u>, 532 U.S. 919 (2001)(a district court may deny a petition on the merits, pursuant to 28 U.S.C. §

2254(b)(2), where "it is perfectly clear that an applicant does not raise even a colorable federal claim").

III.   <u>STANDARD GOVERNING REVIEW OF § 2254 CLAIMS</u>

The Court recognizes that a <u>pro</u> <u>se</u> pleading is held to less stringent standards than more formal pleadings drafted by attorneys.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).  Thus, a <u>pro</u> <u>se</u> habeas petition should be construed liberally and with a measure of tolerance.  <u>See</u> <u>Royce v. Hahn</u>, 151 F.3d 116, 118 (3d Cir. 1998); <u>Duarte v. Hurley</u>, 43 F. Supp.2d 504, 507 (D.N.J. 1999).  Because Harris is a <u>pro</u> <u>se</u> litigant, the Court will accord his petition the liberal construction intended for <u>pro</u> <u>se</u> petitioners.

Under § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts in habeas matters must give considerable deference to determinations of the state trial and appellate courts.  <u>See</u> 28 U.S.C. § 2254(e); <u>Duncan v. Morton</u>, 256 F.3d 189, 196 (3d Cir.), <u>cert</u>. <u>denied</u>, 122 S.Ct. 269 (2001); <u>Dickerson v. Vaughn</u>, 90 F.3d 87, 90 (3d Cir. 1996)(*citing* <u>Parke v. Raley</u>, 506 U.S. 20, 36 (1992)).  Section 2254(d) sets the standard for granting or denying a habeas writ:

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

7

> established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an
>      unreasonable determination of the facts in light
>      of the evidence presented in the State court
>      proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme
Court explained that subsection (d)(1) involves two clauses or
conditions, one of which must be satisfied before a writ may
issue.  The first clause, or condition, is referred to as the
"contrary to" clause.  The second condition is the "unreasonable
application" clause.  Williams, 529 U.S. at 412-13.  In the
"contrary to" clause, "a federal court may grant the writ if the
state arrives at a conclusion opposite to that reached by [the
Supreme] Court on a question of law or if the state court decides
a case differently than [the Supreme] Court has on a set of
materially indistinguishable facts."  Id.  Under the
"unreasonable application" clause, a federal court may grant the
writ if "the state court identifies the correct governing legal
principle from [the Supreme] Court's decisions but unreasonably
applies that principle to the facts of [the petitioner's] case."
Id. at 413.  Habeas relief may not be granted under the
"unreasonable application" condition unless a state court's
application of clearly established federal law was objectively
unreasonable; an incorrect application of federal law alone is

not sufficient to warrant habeas relief.  <u>Id.</u> at 411.  <u>See also</u> <u>Werts v. Vaughn</u>, 228 F.3d 178, 197 (3d Cir. 2000), <u>cert</u>. <u>denied</u>, 532 U.S. 980 (2001); <u>Matteo v. Superintendent, SCI Albion</u>, 171 F.3d 877, 891 (3d Cir. 1999), <u>cert</u>. <u>denied</u> <u>sub</u> <u>nom</u> <u>Matteo v.</u> <u>Brennan</u>, 528 U.S. 824 (1999).

Consonant with <u>Williams</u>, the Third Circuit has held that § 2254(d)(1) requires a federal habeas court to make a two step inquiry of the petitioner's claims.  First, the court must examine the claims under the "contrary to" provision, identify the applicable Supreme Court precedent and determine whether it resolves petitioner's claims.  <u>See</u> <u>Werts</u>, 228 F.3d at 196-97; <u>Matteo</u>, 171 F.3d at 888-891.  If the federal court determines that the state court's decision was not "contrary to" applicable Supreme Court precedent, then the court takes the second step of the analysis under § 2254(d)(1), which is whether the state court unreasonably applied the Supreme Court precedent in reaching its decision.  <u>Werts</u>, 228 F.3d at 197.

This second step requires more than a disagreement with the state court's ruling because the Supreme Court would have reached a different result.  <u>Id.</u>  AEDPA prohibits such <i>de novo</i> review. Rather, the federal habeas court must determine whether the state court's application of the Supreme Court precedent was objectively unreasonable.  <u>Id.</u>  In short, the federal court must decide whether the state court's application of federal law, when

9

evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.  Id.; see also Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court."  Id.; see also 28 U.S.C. § 2254(e)(1).  The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence.  See Duncan, 256 F.3d at 196 (*citing* 28 U.S.C. § 2254(e)(1)).  Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings."  Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

VI.  ANALYSIS

A.  Admission of Tape Recording

In his first ground for habeas relief, Harris argues that the tape recording of Wooten and Wilson's telephone conversation should not have been admitted at trial under the co-conspirator hearsay exception because there was no independent proof of testimonial trustworthiness.  Harris contends that admission of the tape recording was a violation of the Sixth Amendment's Confrontation Clause.

10

He raised this claim on direct appeal.  Pertinent in this action, Harris argued on appeal that there was no independent evidence of a conspiracy, which the Appellate Division noted was a prerequisite for admission of conspiratorial statements under N.J.R.E. 803(b)(5).  The Appellate Division ruled:

> The controlling principles are well settled.  We briefly describe them here.  Where two or more persons are alleged to have conspired to commit a crime, any statement made by one during the course of and in furtherance of the conspiracy is admissible in evidence against any other member of the conspiracy.  N.J.R.E. 803(b)(5); State v. Phelps, 96 N.J. 500, 508 (1984).  Participation in a conspiracy confers upon co-conspirators the authority to act in one another's behalf to achieve goals of the unlawful scheme.  Since conspirators are substantively liable for the acts of their co-conspirators, they are equally responsible for statements by their confederates to further the unlawful plan.  Id. at 510; see also State v. Carbone, 10 N.J. 329, 339-40 (1952).  The co-conspirator exception to the hearsay rule does not abridge a defendant's right to confront the witness against him.  State v. Varona, 242 N.J. Super. 474, 483 (App. Div.)(citing State v. Boiardo, 111 N.J. Super. 219, 230 (App. Div.), certif. denied, 57 N.J. 130 (1970), cert. denied, 401 U.S. 948, 91 S.Ct. 931, 28 L.Ed.2d 231 (1971)), certif. denied, 122 N.J. 386 (1990).  The exception has long been recognized and upheld, notwithstanding that the opportunity to cross-examine is denied.  The circumstances afford a sufficient guarantee of testimonial trustworthiness.  State v. Seaman, 114 N.J. Super. 19, 28 (App. Div. 1971), cert. denied, 404 U.S. 1015, 92 S.Ct. 674, 30 L.Ed.2d 662 (1972); see also Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).
>
> Three distinct conditions must be met for statements to qualify for admission under N.J.R.E. 803(b)(5).  First, the statement must be made in furtherance of the conspiracy. State v. Rios, 17 N.J. 572, 596 (1955).  Second, the statement must have been made in the course of conspiracy.  State v. Carbone, 10 N.J. at 340.  Third, there must be evidence of the existence of the conspiracy and the defendant's relationship to it independent of the hearsay. State v. Phelps, 96 N.J. at 510.

11

We are satisfied that the foundational basis for admission of the recorded statement was satisfied.  As we noted earlier in our opinion, the State's theory was that defendant was hired by Wooten and Wilson to avenge the victim's violent assaults on Wooten's sister.  Stated somewhat differently, defendant agreed to kill in exchange for money by Wooten and Wilson.  We hold that the conspiracy continued until each and every conspiratorial objective and goal was accomplished, including tender of payment.  <u>See</u> <u>State v. Hunt</u>, 115 N.J. 330, 367-68 (1989); <u>State v. Yedwab</u>, 43 N.J. Super. 367, 374 (App. Div.), <u>certif</u>. <u>denied</u>, 23 N.J. 550 (1957).  Because the telephone conversation directly concerned the contemplated payment to defendant, we regard the statement as made in the course and in the furtherance of the conspiracy.

We are also convinced that the State presented ample independent proof of the existence of the conspiracy and defendant's participation in the unlawful agreement.  We need not recite this evidence in detail.  Suffice it to say, the record reeks of defendant's guilt even were we to ignore the taped conversation.  It is thus apparent that the existence of the conspiracy and defendant's participation were established wholly apart from the hearsay declarations.

(RE 6, at pp. 10-12).

The Sixth Amendment of the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."  New Jersey Rule of Evidence 801(c) is identical to the Federal Rule of Evidence 801(c) and defines hearsay as, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Hearsay evidence has the potential to violate the Confrontation Clause, as the accused is not able to cross-examine the declarant.  <u>See</u> <u>Bruton v. United States</u>, 391 U.S. 123, 126-28 (1968).  However, the admission of hearsay

12

evidence does not automatically result in a violation of the
Confrontation Clause.  See Lam v. Kelchner, 304 F.3d 256, 270 (3d
Cir. 2002)(citing Dutton v. Evans, 400 U.S. 74 (1970); Ohio v.
Roberts, 448 U.S. 56, 66 (1980)).[2]  Rather, "the concern under
the Confrontation Clause is 'a practical concern for the accuracy
of the truth-determining process,' and whether the statement
exhibits sufficient indicia of reliability."  Id. at 271 (quoting
Dutton, 400 U.S. at 88-89).

Under Fed.R.Evid. 801(d)(2)(E), "a statement by a
coconspirator of a party during the course of and in furtherance
of the conspiracy" is not hearsay.  This federal rule is
substantially similar to New Jersey's rule, which the Appellate
Division considered.[3]  For hearsay statements to be admissible

---

[2]  In Crawford v. Washington, 541 U.S. 36 (2004), the
Supreme Court overruled Ohio v. Roberts, which had allowed the
admission of a statement of an unavailable declarant so long as
the hearsay was adequately reliable either through a firmly
rooted hearsay exception or by a "showing of particularized
guarantees of trustworthiness."  Roberts, 448 U.S. at 65-70.  In
Crawford, the Supreme Court held that testimonial hearsay
statements should not be admitted against a criminal defendant
unless the declarant is unavailable and the defendant had a prior
opportunity for cross-examination.  541 U.S. at 52-54).

This Court does not find Crawford applicable in this case
because Crawford applies only to testimonial statements made
before trial, such as during preliminary hearings, grand jury
proceedings, prior trials, and statements given during police
interrogation.  The statement at issue here is a tape recorded
conversation, not "testimonial" evidence.  Moreover, Crawford is
not applicable to co-conspirator hearsay.

[3]  The comparable rule in New Jersey state courts is
N.J.R.E. 803(b)(5), which states that where two or more persons

under this rule, the district court must find by a preponderance of the evidence "(1) that a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." United States v. McGlory, 968 F.2d 309, 333 (3d Cir. 1992)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).  This coconspirator exception to the hearsay rule is a "firmly rooted" exception for purposes of satisfying the interests protected by the Confrontation Clause of the Sixth Amendment.  Bourjaily, 483 U.S. 171; United States v. Inadi, 475 U.S. 387 (1986).

In this case, the appellate court specifically found that the taped telephone statements were made during the course of and in furtherance of the conspiracy "[b]ecause the telephone conversation directly concerned the contemplated payment to defendant." (RE 6, at pg. 12).  Further, the court found ample independent evidence of the conspiracy which established the existence of the conspiracy "wholly apart from the hearsay declarations." (Id.).

---

are alleged to have conspired to commit a crime, any statement made by one during the course of and in furtherance of the conspiracy is admissible in evidence against any other member of the conspiracy.

14

Indeed, the Appellate Division stated that "the record reeks of defendant's guilt even were we to ignore the taped conversation." (Id.). The trial court also found "independent proof beyond a reasonable doubt that there was a conspiracy." (RE 25, 4T 29:8-9). This independent proof included: Harris' unsigned statement which detailed his involvement in the incident; Terry Coleman's oral testimony that Harris indicated to him that someone paid him $500 to shoot somebody; Lawrence Wooten's testimony, the son of the co-conspirator and co-defendant Georgia Wooten, that he received $500 from his mother on the day of the shooting; Lawrence Wooten's testimony that the call occurred shortly after the shooting and identifying the caller as Walter Wilson, who asked to speak with Lawrence's mother. (RE 25, 4T 29:11-31:25). Thus, this Court finds that the above independent evidence of a conspiracy as adduced at trial was more than sufficient to guarantee the tape's trustworthiness as proof of the existence of a conspiracy. Based on these proofs, the taped statements were sufficiently reliable and accurate to be admitted under the co-conspirator hearsay exception.[4]

_____

[4] Harris appears to argue that admission of the taped telephone conversation violated Bruton v. United States, 391 U.S. 123 (1968). This Court does not agree. Bruton is inapplicable here because the taped conversation was not made in a confession, but rather, in the furtherance of the conspiracy. As such, the taped conversation constitutes a "firmly rooted hearsay exception." Lilly v. Virginia, 527 U.S. 116, 124 (1999); United

Therefore, Harris has not shown, as required by 28 U.S.C. § 2254(d), that the actions of the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Accordingly, this ground for a writ of habeas corpus will be denied.

B.   The Alleged Perjured Testimony of Terry Coleman

In his second claim, Harris asserts that he was denied a fair trial because his conviction was based on the perjured testimony of Terry Coleman that had been induced by the police. In a statement dated March 29, 2000, Coleman recanted his testimony years after the trial and stated that he had lied because the victim was his best friend.  Coleman also allegedly stated that, before trial, Investigator William O'Donnell told him to change the time Coleman last saw the victim.  Harris claims that this recantation is "newly discovered evidence" warranting a new trial.

Harris further states, somewhat inconsistently, that the information about Investigator O'Donnell should have been

---

States v. Alcantar, 271 F.3d 731, 739 (8th Cir. 2001), cert. denied, 535 U.S. 964 (2002); Bisnett v. Kelly, 221 F. Supp.2d 373, 389-90 (E.D.N.Y. 2002).

16

disclosed to petitioner before or during trial as potential Brady[5] material because it bore on the credibility of Coleman's testimony, who was called as a State witness at trial.  Thus, he contends a new trial is warranted because he has established that the State's case included perjured testimony which the prosecutor knew of or should have known, and that such perjured testimony affected the judgment of the jury.

These claims were raised in Harris' PCR proceedings.  With respect to Coleman's statement recanting his trial testimony, the PCR judge noted at the PCR hearing that it "really doesn't contain evidence that's material to the case", and that both Coleman and Harris are prisoners at the same institution, "[s]o they can talk every day that they want to.  So they could write as many letters as they want and they can continue to write as many letters as they want, because they, if not share the same tier, share the same penal institution as confined inmates in the State of New Jersey.  So you can give a recantation statement as much value as you feel its worth under the circumstances." (RE 29, PCRT 14:17-15:6).

In denying the claim, the court found:

The issue regarding the alleged recantation statement from Terry Coleman fails to satisfy the New Jersey "newly discovered evidence" standard.  Mr. Coleman's statement dated March 29, 2000, contains no evidence that is material to the case, based on the other prosecution evidence that

---

[5]   Brady v. Maryland, 373 U.S. 83 (1963).

17

was presented at the trial, nor was it of a nature as to probably change the jury's verdict.

It is noteworthy to observe that at the time of the statement, Mr. Coleman was prisoner #401863 in East Jersey State Prison which is the very same prison where Mr. Harris continues to be incarcerated.

(Judge Codey's Letter Decision dated December 3, 2001, annexed to RE 10 at Da68, Da73).

The respondents contend that Harris' claim of newly discovered evidence is not a ground for habeas relief under Herrera v. Collins, 506 U.S. 390, 400 (1993)("Claims of actual innocence based upon newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding").  The State also argues that there was no Brady violation because the recantation statement occurred six years after the trial.  Harris provides no proof that the prosecutor knew at the time of trial that Coleman's testimony was false and impermissibly used the perjured testimony to convict Harris.

This Court agrees with the state PCR court as to its finding that the recantation statement was not material to the case based on other State evidence at trial which supported Harris' involvement.  The recantation statement did not contain any information that would have likely changed the jury's verdict. Most significantly, there was eyewitness testimony from another

18

witness, Lawrence Wooten, in which Wooten stated that he saw
Harris murder Germany.  Harris' own statement related that he
shot the victim, although he stated that he did so only after the
victim charged him.

Moreover, the reliability of the statement, made six years
after conclusion of the trial and by a person who is incarcerated
with petitioner, is highly questionable and suspect.  Harris also
fails to show that the prosecutor knew that Coleman's testimony
was false at the time yet used the testimony to convict Harris
anyway.  The accusation is based solely on Coleman's recantation
statement, which has been deemed unreliable and questionable.
There is nothing to suggest that the prosecutor knew or was aware
of any perjury at the time of trial.  At most, it is conceivable
that the prosecutor may have had some doubts about the overall
accuracy of Coleman's testimony, but that is a far cry from
having knowledge of actual perjury.  See Bank of Nova Scotia v.
United States, 487 U.S. 250, 261 (1988).  Coleman took many years
before he ventured his recantation.  Thus, it is quite reasonable
to assume, without any evidence or other factual support from
petitioner, that the State believed Coleman was testifying
truthfully at trial.  There is simply no indicia of reliability
that Coleman's late recantation is true.

Furthermore, as mentioned on state court review and in this
Court's own Opinion herein, there was overwhelming evidence of

19

Harris' guilt that substantially outweighs any prejudicial impact
of Coleman's trial testimony if it were now determined to be
untruthful, which it is not.  Consequently, Harris does not meet
the requirements of "newly discovered" evidence and he has not
demonstrated that an independent constitutional violation
occurred in the state criminal trial.  Therefore, Harris has not
shown, as required by 28 U.S.C. § 2254(d), that the actions of
the state courts "resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of the United
States," or "resulted in a decision that was based on an
unreasonable determination of the facts in light of the evidence
presented in the State court proceeding."  This ground for a writ
of habeas corpus will likewise be denied for lack of merit.

C.   Ineffective Assistance of Trial and Appellate Counsel

     Next, Harris asserts that he was denied effective assistance
of trial and appellate counsel in violation of his Sixth and
Fourteenth Amendment rights.  He alleges that: (1) trial counsel
failed to adequately advise petitioner about his right to testify
at trial; and (2) trial counsel failed to object to jury
instructions on conspiracy to commit murder.  Harris also alleges
that his appellate counsel was ineffective in failing to review
the record and raise the above claims on direct appeal.

The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  Under <u>Strickland</u>, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  <u>Id.</u> at 688-89; <u>Jacobs v. Horn</u>, 395 F.3d 92, 102 (3d Cir. 2005); <u>Keller v. Larkins</u>, 251 F.3d 408, 418 (3d Cir.), <u>cert</u>. <u>denied</u>, 534 U.S. 973 (2001).  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  <u>Strickland</u>, 466 U.S. at 688.  "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  <u>Id.</u>  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the

21

> defendant must overcome the presumption that, under the
> circumstances, the challenged action "might be
> considered sound trial strategy."

Id. at 689 (citations omitted); see also Virgin Islands v.

Wheatherwax, 77 F.3d 1425, 1431 (3d Cir.), cert. denied, 519 U.S.

1020 (1996).

    If able to demonstrate deficient performance by counsel,

petitioner must also show that counsel's substandard performance

actually prejudiced his defense.  Strickland, 466 U.S. at 687.

Prejudice is shown if "there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the

proceeding would have been different.  A reasonable probability

is a probability sufficient to undermine confidence in the

outcome."  Id. at 694.  The reviewing court must evaluate the

effect of any errors in light of the totality of the evidence.

Id. at 695-96.  Thus, the petitioner must establish both

deficient performance and resulting prejudice in order to state

an ineffective assistance of counsel claim.  Id. at 697.  See

also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

    1.  *Failure to Advise on Right to Testify at Trial*

    Harris raised this claim in his state PCR proceedings.  He

alleges that trial counsel failed to investigate the law

regarding his right to testify.  Counsel advised Harris not to

testify at trial given his prior convictions without requesting a

hearing to determine what the convictions were.

22

A defendant in a criminal trial has a constitutional right to testify on his or her own behalf.  <u>Rock v. Arkansas</u>, 483 U.S. 44, 51-53 (1987).  The right to testify at one's trial is a fundamental right which can be waived "only by an 'intentional relinquishment or abandonment.'"  <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938).  A criminal defendant's right to testify is personal and may not be waived by counsel.  <u>Jones v. Barnes</u>, 463 U.S. 745, 751 (1983); <u>United States v. Leggett</u>, 162 F.3d 237, 245 (3d Cir. 1998), <u>cert</u>. <u>denied</u>, 528 U.S. 868 (1999); <u>United States v. Pennycooke</u>, 65 F.3d 9, 10 (3d Cir. 1995); <u>United States v. Lore</u>, 26 F. Supp.2d 729, 735 (D.N.J. 1998).

In this case, the trial court made a direct inquiry of Harris regarding his election not to testify:

> COURT:    Mr. Harris, I just want to make sure that you're in agreement.  Your attorneys have advised the Court that you've elected not to take the stand. I want to make it absolutely clear on the record, Mr. Harris, you do have the right to take the stand.  Under our Constitution, both the State and Federal, you don't have to take the stand, but if you want to get on the stand, and tell your version of the events, or what happened, you have that right.
>
> Mr. Beam and Ms. Adubato had advised me that you choose not to take the stand.
>
> HARRIS:   Yes, sir.
>
> COURT:    Did you talk that all over with the attorneys?
>
> HARRIS:   Yes, sir.
>
> COURT:    You agree with their decision?

23

HARRIS:    Yes.

(RE 26, 5T 10:9-24).

At the PCR hearing, Harris told the judge:

I shoulda' took the stand and gave my version, because I
would had a much better chance, if they would hear my point
of view of what took place.  I never was given the
opportunity to, you know, because my attorneys were telling
me not to take the stand.  So you want to listen to them if
you don't know too much about the law.  So I went did --
with their initial decision not for me to take the stand,
but I always feel if I would have took the stand and told my
version of what happened, --

(RE 29, PCRT 21:11-23).

The PCR judge returned that petitioner would have been

convicted of felony murder "in about five minutes" if petitioner

testified because Harris admitted in his statement that he was

being paid and that he had a gun.  The court then asked Harris

how would he have explained the gun, or the fact that he shot the

victim twice, or that he pursued the victim with a gun rather

than just turning away.  (RE 29, PCRT 22:9-24:5).  Ultimately,

the PCR court ruled that the record did not support or give rise

to a fair inference that his trial counsel was deficient in any

way.  Moreover, citing Strickland, the court found that even if

counsel was deficient, it "was not so deficient as to create a

reasonable probability that these deficiencies materially

contributed to defendant's conviction."  (RE 10, at Da71).

Having reviewed the record, this Court does not find any

deficient representation by counsel with respect to advising

24

Harris of his right to testify.  Harris admitted that his counsel informed him of his right, and that Harris freely chose not to testify.  The Court also finds that even if counsel was deficient in not requesting a hearing on petitioner's prior convictions, petitioner has not satisfied the prejudice prong under Strickland.  There was little to no likelihood that petitioner's testimony at trial would have altered the outcome.  As the PCR court pointed out, Harris would have had difficulty explaining his version of events because he had admitted in his statement that he went after the victim with a gun, and chased him after he shot him the first time.

Therefore, this Court finds nothing in the record to indicate that the state court decisions on this issue were based on an unreasonable application of the facts in light of the evidence presented at trial.  Nor were the decisions contrary to established federal law.  Harris has not demonstrated that the state court decisions, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  Matteo, 171 F.3d at 891.  Accordingly, this claim of ineffective assistance of counsel will be denied as meritless.

2.  *Failure to Object to Jury Instructions*

On this ground, Harris contends that counsel was ineffective because he failed to object to the jury charge on conspiracy to commit murder.  Specifically, he complains that "the trial court

25

failed to relate the conspiracy charge with serious bodily injury which an unintentional death results, or to the underlying lesser included offenses of manslaughter." (Pet. Brief at pg. 15).

Harris raised this claim in his state PCR petition. However, the PCR court found that the jury instructions "did in fact provide the legally required criteria and law for evaluating each and every single count in the indictment." (RE 10, at Da73).

Questions relating to jury charges are normally matters of state law and are not cognizable in federal habeas review. See Engle v. Isaac, 456 U.S. 107 (1982); Henderson v. Kibbe, 431 U.S. 145 (1977); Zettlemoyer v. Fulcomer, 923 F.2d 284, 309 (3d Cir.), cert. denied, 502 U.S. 902 (1991); Grecco v. O'Lone, 661 F. Supp. 408, 412 (D.N.J. 1987)(Thompson, J.). Only where the jury instruction is "so prejudicial as to amount to a violation of due process and fundamental fairness will a habeas corpus claim lie." Id.

Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the

26

> Constitution.  And we also bear in mind our previous
> admonition that we "have defined the category of
> infractions that violate 'fundamental fairness' very
> narrowly."  "Beyond the specific guarantees enumerated
> in the Bill of Rights, the Due Process Clause has
> limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations
omitted).  Thus, the Due Process Clause is violated only where
"the erroneous instructions have operated to lift the burden of
proof on an essential element of an offense as defined by state
law." Smith v. Horn, 120 F.3d 400, 416 (1997), cert. denied, 522
U.S. 1109 (1998).  See also In re Winship, 397 U.S. 358, 364
(1970) ("the Due Process Clause protects the accused against
conviction except upon proof beyond a reasonable doubt of every
fact necessary to constitute th crime with which he is charged");
Sandstrom v. Montana, 442 U.S. 510, 523 (1979) )(jury
instructions that suggest a jury may convict without proving each
element of a crime beyond a reasonable doubt violate the
constitutional rights of the accused).

Where such a constitutional error has occurred, it is
subject to "harmless error" analysis.  Smith v. Horn, 120 F.3d at
416-17 (1997); Neder v. United States, 527 U.S. 1, 8-11 (1999).
"[I]f the [federal habeas] court concludes from the record that
the error had a 'substantial and injurious effect or influence'
on the verdict, or if it is in 'grave doubt' whether that is so,
the error cannot be deemed harmless." Smith v. Horn, 120 F.3d at

27

418 (citing <u>California v. Roy</u>, 519 U.S. 2, 5 (1996)).  In
evaluating a challenged instruction,

> a single instruction to a jury may not be judged in
> artificial isolation, but must be viewed in the context
> of the overall charge.  If the charge as a whole is
> ambiguous, the question is whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way that violates the
> Constitution.

<u>Middleton v. McNeil</u>, 541 U.S. 433, 437 (2004) (internal
quotations and citations omitted).

This Court finds no error in the jury charge overall or with
respect to the charge of conspiracy that would give rise to a
claim of ineffective assistance of counsel for failing to object
to the charge.  The trial judge charged the jury on all elements
of both the conspiracy count and the murder count.  The
instructions were properly framed in such a way that the jury
could not convict Harris on the conspiracy count unless they were
convinced beyond a reasonable doubt that Harris conspired to
commit murder.  The judge also instructed the jury on the lesser
included offenses of passion/provocation manslaughter, aggravated
manslaughter, and reckless manslaughter.  (RE 26, 5T 121:4-125:8;
125:10-130:7).  Clearly, the jury rejected these lesser offenses
and found petitioner guilty of murder based on the overwhelming
evidence of Harris' guilt.  Consequently, to the extent there may
have been an error in failing to object to jury charge on the

28

conspiracy count, which the Court does not find, any such error
was plainly harmless.

Moreover, as pointed out by the State, the conspiracy
conviction was merged with the murder conviction for sentencing
purposes.  Thus, habeas relief from the conspiracy conviction is
unavailing because Harris is not confined on that conviction.

Therefore, upon thorough review of the record, this Court
finds nothing to indicate that the state court decisions (which
concluded there was no error, and hence, no ineffective
assistance of counsel) were based on an unreasonable application
of the facts in light of the evidence presented at trial.  Nor
were the decisions contrary to established federal law.  Harris
has not demonstrated that the state court decisions, when
evaluated objectively and on the merits, resulted in an outcome
that cannot be reasonably justified.  Matteo, 171 F.3d at 891.
Accordingly, this claim of ineffective assistance of counsel is
without merit.

3.  *Ineffective Appellate Counsel*

Claims of ineffective assistance of appellate counsel also
are evaluated under the Strickland standard.  See Wright v.
Vaughn, 2004 WL 1687865, *6, n.10 (E.D. Pa. July 26, 2004).  In
order to prevail on a claim that appellate counsel was
ineffective, Harris must show that (1) counsel's performance fell
below an objective standard of reasonableness, and (2) there was

a reasonable probability, but for counsel's deficiency in raising the arguments on appeal, that the conviction would have been reversed on appeal.  See Buehl v. Vaughn, 166 F.3d 163, 173-74 (3d Cir. 1999), cert. dismissed, 527 U.S. 1050 (1999).

Here, Harris merely argues that his appellate counsel was ineffective for failing to raise the ineffective assistance of trial counsel claims on direct appeal.  Based on review of the record, this Court finds that Harris fails to establish deficient performance by appellate counsel.  He also fails to demonstrate how any alleged failure by appellate counsel would have had any reasonable potential for affecting the outcome of the appeal. Therefore, this Court cannot conclude that the determination of this issue by the state courts resulted in a decision that was contrary to, or involved an unreasonable application or determination of law or fact.  Williams v. Taylor, supra.  This ground for habeas relief will be denied accordingly.

D.   Molisso's Testimony Violated Harris' Right of Confrontation

In his last claim for habeas relief, Harris asserts that part of Det. Molisso's trial testimony violated his federal constitutional right of confrontation as guaranteed under the Sixth Amendment.  On direct appeal, Harris argued that the testimony of Det. Molisso violated State v. Bankston, 63 N.J. 263 (1973), the hearsay rule, and the Sixth Amendment right to confront witnesses against him.  Specifically, Harris alleges

30

that the trial court erred by allowing Det. Molisso to testify, over defense counsel's objection, that he considered Harris a suspect in the shooting by reason of information received from Georgia and Michelle Wooten.  The trial court did give a curative instruction at the end of the case:

> You also heard some testimony which came in from the police witnesses, ... regarding the contents of statements taken from persons who are not on trial in this case, co-defendants, and also from other lay witnesses, Michelle Wooten ... .  That testimony was admitted not in any way for the truth of anything the officer may have disclosed about what was said during the course of taking of those statements by those other parties, but it is only allowed in specifically for the limited purpose to advise you of the actions that were taken by the police officers during their investigation, and you should not consider that testimony in your deliberations for any other purpose other than to let you know that the police did this, took this step, and then they went to the next step.  That's it.  Anything else is not a proper use of that sort of testimony.

(RE 26, 5T 158:25-159:16).

The Appellate Division agreed with petitioner that the detective's testimony violated Bankston, but found that the error was harmless.  In Bankston, the New Jersey Supreme Court held that the hearsay rule is not violated when a police officer explains that the reason he approached a suspect was based "upon information received", because such testimony explains the officer's subsequent conduct and shows that the officer was not acting in arbitrary manner. 63 N.J. at 268.  However, if the officer specifically repeats what another person told him about the crime by the accused, such testimony violates the hearsay

31

rule and the Sixth Amendment right to be confronted by witnesses.
Id. at 268-69.  The appellate court stated:

> Detective Molisso's testimony violated Bankston and its
> progeny. ...  We are thus mystified with respect to the
> reason for the prosecutor's meandering into this thicket.  A
> prosecutor should not either in subtle or obvious fashion
> elicit accusations against the defendant by nontestifying
> witnesses.  Testimony that skirts the edges of impermissible
> hearsay is neither desirable nor worth the risk of reversal
> of what may be a well-deserved conviction.
>
> We are nevertheless clearly convinced that the error was
> harmless beyond a reasonable doubt.  The detective's
> fleeting allusion to the information he received from
> Georgia and Michelle Wooten did not deny defendant a fair
> trial.  The impermissible testimony occupies a single line
> of an extensive transcript containing overwhelming evidence
> of defendant's guilt.  In the context of the entire trial,
> we are satisfied that this minor untoward incident did not
> have the capacity to produce an unjust result.

(RE 6, at pp. 14-15).

The appellate court correctly noted that a Confrontation
Clause error is subject to a harmless error analysis.  Delaware
v. Van Arsdall, 475 U.S. 673, 681-84 (1986); Smith v. Horn, 120
F.3d at 416-17 (1997); Neder, 527 U.S. at 11.  A constitutional
error is deemed harmless only when "it appears 'beyond a
reasonable doubt that the error complained of did not contribute
to the verdict obtained.'"  Neder, 527 U.S. at 15 (quoting
Chapman v. California, 386 U.S. 18, 24 (1967)).  Moreover, the
Supreme Court has expressly held that habeas relief is not
attainable "if the state court simply erred in concluding that
the State's errors were harmless; rather, habeas relief is
appropriate only if the [state court] applied the harmless-error

review in an 'objectively unreasonable' manner." <u>Mitchell v. Esparaza</u>, 540 U.S. 12, 18 (2003)(citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-77 (2003)).  "'A defendant is entitled to a fair trial but not a perfect one.'" <u>Bruton v. United States</u>, 391 U.S. 123, 135 (1968)(quoting <u>Lutwak v. United States</u>, 344 U.S. 604, 619 (1953)).

This Court has reviewed the trial record in its entirety and concurs with the state court's determination that admission of the fleeting hearsay testimony by Det. Molisso was harmless error.  There was overwhelming evidence of Harris' guilt, including eyewitness identification and Harris' concession that he did, in fact, shoot the victim.  Moreover, a curative instruction was given to the jury with respect to the officer's brief testimony.  <u>See</u> <u>Roberto v. Stephens</u>, Civ.A.No. 92-3245, 1993 WL 276904 at *10-11 (D.N.J. July 23, 1993)(substantial evidence of defendant's guilt at trial rendered any error in the admission of hearsay testimony harmless).

Therefore, this Court finds nothing to indicate that the state court decision (which concluded there was no error, and hence, no ineffective assistance of counsel) was based on an unreasonable application of the facts in light of the evidence presented at trial.  Nor was the state court ruling contrary to established federal law.  Harris has not demonstrated that the state court decision, when evaluated objectively and on the

merits, resulted in an outcome that cannot be reasonably justified.  <u>Matteo</u>, 171 F.3d at 891.  Hence, this claim for habeas relief is denied.

V.  <u>CERTIFICATE OF APPEALABILITY</u>

This Court next must determine whether a certificate of appealability should issue.  <u>See</u> Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

<u>**CONCLUSION**</u>

For the above reasons, this Court finds that the § 2254 habeas petition should be denied on the merits and a certificate of appealability will not issue.  An appropriate Order follows.


    /s/ Jose L. Linares
JOSE L. LINARES
UNITED STATES DISTRICT JUDGE

DATED: November 22, 2005

34